IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 3, 2025

IN RE MICAH N.[1]

**Appeal from the Juvenile Court for Hickman County**
**No. 2024-JV-63      Amy Cook Puckett, Judge**

_____

**No. M2024-01297-COA-R3-PT**

_____

The trial court terminated a mother's parental rights to her minor child based on several statutory grounds. The mother appeals. Discerning no error, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Patricia W. Holder, Centerville, Tennessee, for the appellant, Carrie N.

Jonathan Skrmetti, Attorney General and Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

Micah N. (the "Child") was born to Carrie N. ("Mother") in Nashville, Tennessee in October of 2022. The Child experienced withdrawal symptoms at birth, and his meconium was positive for methamphetamine, amphetamines, and fentanyl. After receiving a referral, the Tennessee Department of Children's Services ("DCS") filed a dependency and neglect petition in the Juvenile Court for Hickman County (the "trial court"), alleging that the Child was dependent and neglected and severely abused. DCS

---

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

sought to transfer custody of the Child to one of his adult siblings, Mother's twenty-one-year-old son. This placement lasted approximately one month before the adult son determined that he was not equipped to care for the Child. The Child entered DCS custody pursuant to order entered on November 29, 2022. DCS placed the Child with Jamie B. ("Foster Mother") at that time. On December 13, 2022, the trial court entered another order noting that Mother was pending acceptance in a rehabilitation program called Renewal House in which Mother would be allowed to keep the Child with her. The order provides that "[u]pon [Mother's] admission to Renewal House's rehabilitation Program, and DCS's delivery of [the Child] to Renewal House, Renewal House shall share legal custody of [the Child] with [Mother], and Renewal House shall retain complete physical custody of [the Child]." Renewal House accepted Mother, and she participated in the program for a short time but did not ultimately complete it. DCS removed the Child from Mother's physical custody and re-placed him with Foster Mother. The trial court later entered an order adjudicating the Child dependent and neglected but reserved ruling on the severe abuse allegation.

Mother and DCS entered into four permanency plans during the custodial period. The first plan is dated January 13, 2023, and required Mother to pay child support; complete an alcohol and drug assessment; submit to random drug screens; participate in meetings with DCS; obtain and maintain stable housing, transportation, and legal income and provide proof of same to DCS; participate in therapeutic visitation for two hours a week; and attend parenting classes. Mother's substance abuse, which persisted throughout the custodial period, presented the biggest barrier to reunification. Mother conceded at trial that she refused drug screens because she knew the tests would be positive and so she did not see the point. Mother participated in some visitation with the Child early in the custodial period, but the trial court entered an order on July 18, 2023, suspending visitation because Mother had yet to participate in a rehabilitation program. Although Mother began at least four rehabilitation programs during the custodial period, she did not successfully complete any of them. The trial court never reinstated Mother's visitation. Mother completed a parenting class and worked as an Uber and DoorDash driver during the custodial period. In the meantime, the Child remained in DCS custody in Foster Mother's home.

DCS filed a petition to terminate Mother's parental rights on March 6, 2024, alleging as statutory grounds abandonment by failure to visit; abandonment by failure to support; abandonment by failure to provide a suitable home; substantial noncompliance with the permanency plans; persistent conditions; severe abuse; and failure to manifest an ability and willingness to assume custody of the Child. The trial court held a final hearing over two days on June 18, 2024 and June 25, 2024. Mother, Foster Mother, and DCS case worker Allison Goldman all testified. Mother testified that she has a history of drinking and cocaine use but remained sober from 2012 through 2017, when she hurt herself and began self-medicating with pain medication. Mother struggled with substance abuse from 2017 through 2021 when she learned she was pregnant with the Child. Mother was

prescribed Subutex but did not take it. Instead, Mother stated that she "cut back on drugs during pregnancy to minimize withdrawal." Mother also testified that she did not have a permanent residence and stayed either with a friend or with her father and that she makes ends meet by driving for apps such as Uber and DoorDash. Mother expressed gratitude towards Foster Mother and stated that if custody could be returned to Mother, Mother would like Foster Mother to remain a presence in the Child's life. As for Foster Mother, she confirmed that the Child first came into her care in November 2022 and has remained there ever since.[2] She testified that the Child is doing well and benefits from physical and occupational therapy, as well as speech therapy. Foster Mother also confirmed that the Child has a relationship with his biological adult siblings and that they visit the Child approximately once a month. Foster Mother intends to continue allowing the Child's siblings to visit even if Mother's parental rights are terminated.

Ms. Goldman testified extensively, explaining that she was the Child's case worker for the entire custodial period, aside from a short period in which Ms. Goldman took maternity leave. Overall, Ms. Goldman's testimony reflects that although Mother took some steps toward reunification, substance abuse remained a barrier for Mother. Ms. Goldman also testified that she never successfully completed a home visit for Mother and that Mother's contact with Ms. Goldman was intermittent during the custodial period. According to Ms. Goldman, the Child was bonded to his foster family and thriving in his placement.

The trial court entered an extensive written order terminating Mother's parental rights on July 25, 2024. The trial court concluded that DCS proved all alleged statutory grounds for termination by clear and convincing evidence and that terminating Mother's parental rights was in the Child's best interests. Mother filed a timely appeal to this Court.

## ISSUES

Mother challenges the trial court's conclusion as to all statutory grounds, as well as the trial court's conclusion that termination is in the Child's best interests.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden

---

[2] Excluding the period in December of 2022 when the Child resided briefly with Mother at Renewal House.

- 3 -

"minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

## DISCUSSION

*Grounds for termination*

The trial court found that DCS proved all alleged statutory grounds for termination by clear and convincing evidence. We address each of those grounds in turn beginning with abandonment.

### a. Abandonment by failure to visit & failure to support

Tennessee Code Annotated section 36-1-113(g) provides that abandonment, as defined in section 36-1-102, is a ground for terminating parental rights. Tenn. Code Ann. § 36-1-113(g)(1) (2023).[3] Section 36-1-102(1)(A)(b) provides that

> [i]f the child is less than four (4) years of age, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Here, the trial court found that Mother failed to both visit and support the Child in the three consecutive months immediately preceding the petition, which would have been December 5, 2023 through March 5, 2024. With regard to this ground, the trial court reasoned as follows:

> During the three-months look back period, [Mother] has visited zero (0) times. The last visit occurred on May 19, 2023. [Mother] was not in jail or incapacitated during the relative look back period. [Mother] knew that the [C]hild was in DCS custody because she has appeared in Juvenile Court proceedings in the dependency and neglect matter, has participated in Child and Family Team Meetings, entered into permanency plans, and had participated in visitations with the [C]hild while the [C]hild has been in foster care.
>
> [Mother] knew the consequences of her failure to visit the [C]hild regularly because she signed a statement verifying that she received an explanation of

---

[3] In termination cases, we apply the version of the statute in effect at the time the petition to terminate was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). Accordingly, all references herein are to the version of Tennessee Code Annotated that was in effect on March 6, 2024.

those consequences on November 29, 2022, and again on May 2, 2023. DCS also provided [Mother] with copies of permanency plans that contained an explanation of the consequences of her failure to visit the [C]hild regularly.

The Juvenile Court entered orders in July and August of 2023, suspending [Mother's] visitation due to her not providing proof of rehabilitation. [Mother] testified that she knew that her visitation was suspended until she presented proof of completion of in-patient treatment. The Court of Appeals has stated that if "a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so," that parent's failure to visit can be found willful. *In re Kiara C.*, No. 2013-02066-COA-R3-PT, 2014 [] WL 2993845, at 6 (Tenn. Ct. App. June 30, 2014).

At the July 18, 2023, hearing for which [Mother was] represented by counsel, the Juvenile Court ordered that "the request to suspend [Mother's] visitation is granted. However, if [Mother] provides proof of her attendance at a rehabilitation facility and signs a release for DCS to obtain the records, the court will restore [Mother's] previous visitation schedule." Furthermore, [Mother] had control over whether visitation was granted.

[Mother] did not prove that her failure to visit the [C]hild was not willful. [Mother] did not file an answer or otherwise assert the absence of willfulness as a defense. The Court finds by clear and convincing evidence that [Mother's] failure to visit constitutes abandonment.

We agree with the trial court's reasoning. First, the Child was less than four years old when DCS filed its petition to terminate. Second, as the trial court correctly explained, a parent's rights may be terminated for failure to visit when the parent can reinstate visitation but fails to do so. We have specifically held that "when a parent chooses not to cooperate with certain conditions, such as obtaining a drug and alcohol abuse assessment, that choice 'in refusing to cooperate [ ] constitute[s] a willful decision' to discontinue visitation." *In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at *6 (Tenn. Ct. App. Aug. 31, 2018) (quoting *State Dept. of Children's Servs. v. J.A.H.*, No. E2005-00860-COA-R3-PT, 2005 WL 3543419, at *6 (Tenn. Ct. App. Dec. 28, 2005)). It is undisputed that Mother did not visit the Child during the relevant period and that her visitation was suspended pending her completion of an in-patient program. Because Mother never stayed in treatment for more than a few days, the trial court never reinstated visitation. Under these circumstances, the trial court correctly concluded that DCS proved this ground for termination by clear and convincing evidence.

The trial court also concluded that Mother abandoned the Child through failure to support. Again, it is undisputed that Mother failed to pay any child support during the

relevant period. Mother argues on appeal that the record does not establish that Mother has any means with which to pay support. Nonetheless, Mother conceded at trial that she did not pay any support and testified that it was because she planned to enter rehabilitation:

Q. Yes, ma'am. You're not working, and are you under an order to pay child support?

A. Do I what?

Q. Do you pay child support?

A. No, sir.

Q. Not paying any?

A. No, sir. I've been trying to, like, go to rehab and stuff. It's hard to, like, that's been, like, the thing is, like, I've got to go, you know, I've got to get to rehab, so I haven't had, like, haven't been working because that, like, why do I get a job when I know I've got to go to rehab? So it's, like, this rehab thing has, you know, put everything else in my life on hold because that's the first step that I've got to complete to really make everything else be successful.

Nonetheless, Mother also testified that she occasionally drives for various delivery services like DoorDash in order to support herself. Mother testified that she could make up to $25 to $30 per hour just driving for DoorDash. Thus, the record shows that Mother simply did not support the Child while he remained in DCS custody, and Mother's argument that the record contains no proof on this topic is unpersuasive. DCS proved this ground for termination by clear and convincing evidence.

### b. Abandonment by failure to provide a suitable home

The next ground the trial court considered was abandonment by failure to provide a suitable home, which occurs when:

(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing

- 7 -

agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii)(*a*)-(*c*).

With this ground, we "consider[] whether a child has a suitable home to return to after the child's court-ordered removal from the parent." *In re Adaleigh M.*, No. E2019-01955-COA-R3-PT, 2021 WL 1219818, at *3 (Tenn. Ct. App. Mar. 31, 2021). A suitable home requires "more than a proper physical living location." *In re Daniel B.*, No. E2019-01063-COA-R3-PT, 2020 WL 3955703, at *4 (Tenn. Ct. App. July 10, 2020) (quoting *Tenn. Dep't of Children's Servs. v. C.W.*, No. E2007-00561-COA-R3-PT, 2007 WL 4207941, at *3 (Tenn. Ct. App. Nov. 29, 2007)). A suitable home entails "[a]ppropriate care and attention" for the child and "must be free from drugs." *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). DCS should utilize its superior resources in assisting with the establishment of a suitable home, but "[its] efforts do not need to be 'Herculean.'" *In re Jamarcus K.*, No. M2021-01171-COA-R3-PT, 2022 WL 3755383, at *8 (Tenn. Ct. App. Aug. 30, 2022) (quoting *In re Hannah H.*, 2014 WL 2587397, at *9). Sole responsibility does not lie with DCS, and "[p]arents must also make reasonable efforts towards achieving the goals established by the permanency plan to remedy the conditions leading to the removal of the child." *Id.*

Here, the trial court found that Mother did not have a suitable home for the Child primarily because Mother did not achieve sobriety during the custodial period. The record supports this finding. Mother testified candidly about her struggle with addiction at trial. She admitted that she was unable to complete a rehabilitation program. She also conceded, upon questioning by DCS, that she used fentanyl the day before trial and methamphetamine three days before trial. Mother also testified that she did not have a permanent residence

at the time of trial. She alternated staying with friends or with her father. Although Mother's candor is commendable, the fact remains that she is not sober and does not have a home for the Child.

Consequently, DCS proved this ground by clear and convincing evidence, and we affirm.

### c. Substantial noncompliance with permanency plans

Parental rights may also be terminated for "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). Making this determination entails "more than merely counting up the tasks in the plan to determine whether a certain number have been completed[.]" *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002)). This ground is not established simply by showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *8 (Tenn. Ct. App. Jan. 16, 2020) (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *In re M.J.B.*, 140 S.W.3d at 656.

DCS bears the burden of showing "that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place[.]" *Id.* (citing *In re Valentine*, 79 S.W.3d at 547; *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). DCS must also establish "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* (citations omitted). If the trial court does not make a finding with respect to the reasonableness of the parent's responsibilities under the permanency plan, the appellate court reviews this issue de novo. *See In re Valentine*, 79 S.W.3d at 547.

As to this ground, the trial court found in relevant part:

The permanency plans' responsibilities for [Mother] reasonably relate to remedying the reasons for foster care. DCS' Dependency and Neglect Petition filed with the Juvenile Court alleged that the minor child tested positive at birth for illicit and illegal drugs. [Mother] waived the adjudicatory hearing, stipulated to the facts as alleged in the petition, and the Juvenile Court Order reserved the issues of severe abuse. Furthermore, the proof at the TPR trial demonstrates that the minor child tested positive at birth for illicit and illegal drugs based upon [Mother's] admissions and medical documentation. [Mother] has also tested positive for methamphetamine after

the minor child entered foster care. [Mother] stated during her testimony that she had last used fentanyl and meth the week of trial.

The plans' responsibilities and tasks were developed and are designed to remedy those concerns as they include [Mother's] participation and successful completion of an alcohol and drug treatment program and following all recommendations to completion, and address safe and stable housing, free of substance use, for the minor child. The entire time the minor child has lived, both in utero and since days before the Termination of Parental Rights trial, [Mother] has continued to use drugs. [Mother] testified that six to 7 days has been the longest period that she has been able to go without relapse.

Consequently, the trial court reasoned that although Mother completed some permanency tasks, the most important task remained unaddressed. The trial court's analysis is sound. We agree that all of the permanency plans are reasonable and related to remedying the reasons for the Child's initial removal. We also agree that Mother completed some tasks; indeed, Ms. Goldman testified that Mother participated in most meetings, came to visitation prior to the order suspending visitation, and completed a parenting class. Nonetheless, in light of the importance of Mother maintaining sobriety, her inability to comply with this task is dispositive as to this ground. Because it is undisputed that Mother is in substantial noncompliance with the single most important permanency task, DCS proved this ground by clear and convincing evidence.

### d. Persistent conditions

Next, the trial court terminated Mother's rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Section (g)(3)(A) provides that termination may occur when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

As we have previously explained:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion [] that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *Id.* The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, [2008 WL 4613576, at *20] (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at *9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Navada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016).

The trial court found that DCS proved this ground by clear and convincing evidence. We agree. DCS removed the Child from Mother's custody because the Child was positive for illegal substances at birth and because Mother admitted to using drugs while pregnant with the Child. The Child was nearly two years old at the time of trial, and Mother was still actively, and admittedly, using illegal substances. She also did not have a permanent home. Mother attempted rehabilitation four to five times but never successfully completed a program. As such, the conditions prompting the Child's removal very much persisted at

- 11 -

the time of trial, and there is little likelihood the Child can safely return to Mother's care. DCS proved this ground for termination by clear and convincing evidence.

### e. Failure to manifest an ability and willingness to assume custody

The next statutory ground for termination found by the trial court was failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. This ground applies when

> [a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second statutory prong,

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court made the following findings of fact and conclusions of law as to this ground for termination:

Pursuant to Tenn. Code Ann. § 36-1-113(g)(14), the Court finds by clear and convincing evidence that [Mother] has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the [C]hild, and placing him in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild.

The Court is not convinced that the conditions which led to removal of the [C]hild will be remedied at an early date so that he can be returned to his mother soon. Nineteen months (19) is a reasonable amount of time for [Mother] to get sober and make her home safe for her child. Despite [Mother's] testimony that she knew that sobriety needed to be a priority for the minor child, and that the Juvenile Court had ordered that her visitation with the minor child was suspended unless she could provide proof of rehabilitation, [Mother] continued to use drugs as recent as the day before trial. [Mother] has remained in active addiction throughout the minor child's life.

[Mother] has not manifested an ability and willingness to assume legal and physical custody of her child. The Juvenile Court entered an order on March 21, 2024, finding that "Mother has not complied with inpatient treatment or substance abuse treatment, does not have safe and stable housing, has not remained in contact with DCS; Based on Mother's statements in open court, Mother does not have a regular home where she is residing and uses her father's address as a mailing address." [Mother] demonstrated a continued unwillingness and ability to provide fundamental care to her child. She has not been able or willing to provide a stable home that is free from drugs, and it is unsafe to return the minor child to her care.

Furthermore, placing the [C]hild in [Mother's] legal and physical custody would pose a risk of substantial harm to the minor child. Removing him from the [foster] home, his foster family, where he has lived all but approximately two (2) months of his life would pose a risk of substantial harm to his psychological welfare. The minor child is well integrated in their home. He has formed bonds in the [foster] home. [Foster Mother] also has facilitated sibling visitation between the minor child and his biological siblings to keep their bonds intact as well. The minor child has lived in the [foster] home since November of 2022 except during the period of December 14-23, 2022, while [Mother] attempted rehabilitation at Renewal House.

(Footnote omitted).

Based on all of the foregoing, the trial court found that DCS proved this ground for termination by clear and convincing evidence. We agree. Simply put, the record supports all of the trial court's findings. Mother conceded at trial that she is not sober and still struggles with substance abuse and stable housing. While Mother's words suggest willingness to assume custody of the Child, her perfunctory attempts at rehabilitation undercut her claims. In any event, Mother is in no way able to assume custody of the Child at this juncture. Given the Child's attachments in his current foster home, we also agree with the trial court that removing the Child would be a huge detriment.

Consequently, Mother's parental rights were correctly terminated pursuant to section 36-1-113(g)(14).

### f. Severe abuse

Finally, the trial court determined that Mother committed severe abuse as to the Child. Parental rights may be terminated when

> [t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4). Among other things, severe abuse is defined as "[k]nowingly or with gross negligence allowing a child under eight (8) years of age to ingest an illegal substance or a controlled substance that results in the child testing positive on a drug screen, except as legally prescribed to the child[.]" Tenn. Code Ann. § 37-1-102(b)(27)(E). Substance abuse during pregnancy constitutes severe abuse. *See In re Leah T.*, No. M2022-00839-COA-R3-PT, 2023 WL 4131460, at *11 (Tenn. Ct. App. June 22, 2023) (collecting cases in which parental rights were terminated for severe abuse when the child or children tested positive for illegal substances at birth). In this case, it is undisputed that Mother abused drugs during her pregnancy and that the Child experienced withdrawal symptoms at birth. Mother admitted this at trial, and the medical proof offered by DCS confirmed the testimony.

Accordingly, the trial court properly determined that Mother's parental rights should be terminated for severe abuse.

### *Best interests*

In addition to proving at least one statutory ground for termination, DCS must prove by clear and convincing evidence that the Child's best interests are served by terminating Mother's parental rights. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d

490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* As such, the focus of the best interests analysis is not the parent but rather the child. *Id.*; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective.").

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated section 36-1-113(i). As the trial court did, we address each factor in turn.

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

This factor weighs heavily in favor of termination. The Child has been with Foster Mother and her family for essentially his entire life. He is bonded to his siblings in the home, and the home is pre-adoptive.

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

In the same vein as factor (A), factor (B) also favors termination. Removing the Child from the only stable home he has ever known and placing him with a caretaker who is struggling with substance abuse and housing is likely to negatively impact the Child's emotional and psychological health.

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

Factor (C) also favors termination. As discussed at length above, Mother struggles with stability due to her ongoing battle with addiction. Mother was unhoused at the time of trial and admittedly used methamphetamine just one day prior. Thus, Mother is unable to meet the Child's basic needs.

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

In this case, DCS placed the Child with his foster family very shortly after his birth. While Mother visited the Child early in the custodial period, visitation could not continue because Mother did not complete rehabilitation. By the time of trial, the Child and Mother had not visited for over a year, and, by all accounts, the Child is bonded to his foster family.

- 15 -

Mother claimed at trial that she bonded with her son while he was in utero. Nonetheless, we consider the best interest factors from the Child's, as opposed to the parent's, perspective. There is no evidence of a healthy parental attachment from the Child's perspective, as he has essentially never known Mother to be his primary caregiver. Factor (D) favors termination.

> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

Although Mother came to visitation at the beginning of the custodial period, the trial court suspended her visitation until Mother completed a substance abuse rehabilitation program. Mother did not meet this condition, and her visitation was never reinstated. At the time of trial, she had not seen the Child in over a year. Accordingly, this factor favors termination.

> (F) Whether the child is fearful of living in the parent's home;

There is no proof in the record regarding this factor.

> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

There was no proof at trial that the Child suffers from post-traumatic symptoms. Nonetheless, it is worth noting that the Child was born in withdrawal and that Mother still struggles with substance abuse.

> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

According to both Ms. Goldman and Foster Mother, the Child is attached to and bonded with his foster parents and foster siblings. The trial court found Ms. Goldman to be a credible witness. This factor favors termination.

> (I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

It is undisputed that the Child's biological siblings, Mother's other children, have fostered a loving relationship with the Child. Foster Mother testified that the siblings are

- 16 -

"very good kids" and that these relationships are healthy and beneficial for the Child. In this respect, this factor could militate against termination. However, Foster Mother testified that she plans to continue allowing the siblings access to the Child. Accordingly, this factor is neutral, as there is no proof in the record that the Child will be cut off from these beneficial relationships should Mother's parental rights be terminated.

> (J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

This factor heavily militates in favor of termination. By her own admission, Mother still struggles with the same issues underpinning the Child's initial removal from her custody. Although Mother attempted changes several times during the custodial period, she was simply unable to complete a treatment program. It is unlikely Mother will be equipped to consistently care for the Child at any point in the near future.

> (K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

Again, Mother attempted rehabilitation programs four to five times but never finished. She also communicated intermittently with Ms. Goldman throughout the custodial period and admitted to "ghosting" Ms. Goldman at times. This factor favors termination.

> (L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

This factor favors termination. Messages in the record show that Ms. Goldman attempted to facilitate communication with Mother throughout the custodial period. Further, Mother entered rehabilitation programs several times. The issue in this case is not that Mother lacked access to the needed resources; rather, the issue is that Mother did not complete the programs. In this regard, it is unclear what further action DCS could have taken to help remedy Mother's primary issue.

> (M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the

circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

This factor clearly favors termination for all of the reasons already discussed.

(N)  Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

As addressed above, the Child tested positive for illegal substances at birth. Under Tennessee law, this constitutes severe abuse. By her own admission, Mother still uses the same substances that caused the Child's positive drug screens. This factor militates heavily in favor of termination.

(O)  Whether the parent has ever provided safe and stable care for the child or any other child;

Mother has never had custody of the Child for more than a few days at a time. To her credit, however, Mother raised four other children whom Foster Mother described as "very good kids." Mother testified to having strong relationships with those other children. This factor is neutral.

(P)  Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

This factor is difficult. Mother could not maintain sobriety during the custodial period and continued struggling with substance abuse by the time of trial. On the other hand, Mother admitted her faults and testified candidly about her issues. Mother clearly understands that she must achieve sobriety in order to provide the Child with a safe and stable home. This factor is neutral.

(Q)  Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)  Whether the physical environment of the parent's home is healthy and safe for the child;

Both factors (Q) and (R) favor termination. Again, Mother is unhoused and has no physical residence in which to raise the Child. She stays with a friend or with her father, and Ms. Goldman testified at trial that she never completed a home visit with Mother

because Mother always cancelled at the last minute. Moreover, a home in which the primary caregiver is abusing drugs is not healthy and safe for a child.

    (S)   Whether the parent has consistently provided more than token financial support for the child; and

Mother has never paid any support for the Child; thus, this factor favors termination.

    (T)   Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

This factor clearly favors termination for all of the reasons already discussed.

Nearly all of the best interest factors favor termination in this case. Simply put, Mother is not equipped to provide the Child with a safe and stable home at this time. By the time of trial, the Child had been in DCS custody for nearly two years, and his foster family is essentially the only family he has ever known. The strongest factor militating against termination here is the undisputedly healthy relationships the Child has with Mother's older children, the Child's biological siblings. Nonetheless, Foster Mother testified to having a great relationship with those children, and we see little risk that the Child will be cut off from his biological siblings if Mother's rights are terminated. In any event, it is not the biological siblings' lifestyle that creates instability for the Child, it is Mother's. Viewing the best interest factors from the Child's perspective, he deserves safety and permanency. Accordingly, the trial court correctly concluded that termination of Mother's parental rights is in the Child's best interests.

Thus, we affirm the trial court in all respects.

## CONCLUSION

The ruling of the Juvenile Court for Hickman County is affirmed. Costs on appeal are assessed to the appellant, Carrie N., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE